# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: __March 31, 2015_____

**NO. 33,300**

**SALVADOR BENAVIDEZ,**

      Plaintiff-Appellant,

v.

**CIBOLA COUNTY SHERIFF'S DEPUTIES STEVEN SHUTIVA, GARRYL JAMES, PAT MARTINEZ, CIBOLA COUNTY UNDERSHERIFF TONY MACE, CIBOLA COUNTY SHERIFF JOHNNY VALDEZ, CIBOLA COUNTY SHERIFF'S DEPARTMENT, CIBOLA COUNTY,**

      Defendants-Appellees**.**

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**John W. Pope and Violet Otero, District Judges**

Law Office of Derek V. Garcia, P.C.
Derek V. Garcia
Albuquerque, NM

for Appellant

Brennan & Sullivan, P.A.
James P. Sullivan
Christina L. G. Brennan
Santa Fe, NM

Robyn Hoffman
Tijeras, NM

for Appellees

**OPINION**

**BUSTAMANTE, Judge.**

{1}    After he was arrested and charged with leaving the scene of an accident, resisting arrest, assault on a peace officer, and assault, Plaintiff Salvador Benavidez sued Deputies Steven Shutiva, Garryl James, Pat Martinez, Cibola County Undersheriff Tony Mace, Cibola County Sheriff Johnny Valdez, Cibola County Sheriff's Department, and Cibola County (Defendants) alleging violations of both the United States and New Mexico Constitutions as well as common law tort claims. The district court granted Defendants' motion for summary judgment on the ground that Defendants were entitled to qualified immunity from suit. Plaintiff appealed. We affirm in part and reverse in part.

**I.    Background**

{2}    Plaintiff was driving on Interstate 40 when his pickup truck was "lightly" rear-ended by a motor home. Plaintiff did not immediately stop and the motor home driver called 911 to report the accident. Defendant James was dispatched and stopped both vehicles. The two drivers disagreed about how exactly the accident occurred; Plaintiff maintained that he was not at fault but the motor home driver asserted that Plaintiff had caused the accident by pulling in front of the motor home and braking suddenly. Two other deputies arrived to assist James.

{3} After James approached Plaintiff's truck, Plaintiff got out and began arguing with James about the cause of the accident. Plaintiff admits that he "aggressively argued his innocence, asking . . . James why he had been stopped and insisting that he had done nothing wrong." He also walked toward the motor home, gesturing with his arms, swearing, and saying "[t]ell me to my face," among other things, to the motor home driver in a loud voice. After Plaintiff either dropped or threw his identification on the ground, and then threw his wallet on the ground, Defendant Shutiva handcuffed Plaintiff and seated him on the bumper of Plaintiff's truck. He was later placed in James's police car and transported to the Cibola County Detention Center. Throughout the encounter, Plaintiff swore at the Defendants and used "racially[]charged language."

{4} Plaintiff was charged with leaving the scene of an accident, assault on the motor home driver, resisting arrest, and assault upon a peace officer. The charges were later dismissed. Plaintiff then filed a complaint under 42 U.S.C. § 1983 (1996) alleging violations of the United States and New Mexico Constitutions and the New Mexico Tort Claims Act (NMTCA). Specifically, he alleged unreasonable seizure/arrest, selective and malicious prosecution, excessive force, retaliation for exercise of the right to freedom of speech, and false imprisonment. The district court granted Defendants' motion to dismiss based on its findings that the arrest and

2

prosecution were supported by probable cause, the force used was reasonable, and Plaintiff's language constituted "fighting words" not protected by the First Amendment of the United States Constitution. Plaintiff appeals the dismissal of his complaint. Additional facts are provided as necessary to our discussion.

## II.    Discussion

**Section 1983 and Qualified Immunity**

{5}     "A person acting under color of state law who violates the rights of a plaintiff established by the United States Constitution or federal statutes may be held personally liable for his or her action under 42 U.S.C. § 1983." *Archuleta v. Lacuesta*, 1999-NMCA-113, ¶ 7, 128 N.M. 13, 988 P.2d 883. Section 1983 claims are "limited to deprivations of federal constitutional rights and federal statutory and regulatory rights. It does not cover official conduct that violates only state law." 1 Martin A. Schwartz, *Distinguishing Federal Constitutional Violations From State Law Wrongs, Section 1983 Litigation Claims & Defenses* § 3.02 (4th ed. 2007) (footnote omitted); *accord Wells v. Valencia Cnty.*, 1982-NMSC-048, ¶ 6, 98 N.M. 3, 644 P.2d 517. Although courts often use common law torts as analogues to claims under § 1983, such as false arrest, false imprisonment, malicious prosecution, assault, and battery, "the ultimate question is whether [a] plaintiff can prove a constitutional violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1288 (10th Cir. 2004); *see* Schwartz,

*supra*, § 3.02 ("[C]ourts frequently experience difficulties in determining whether conduct that is actionable under state tort law . . . also violates some provision of the federal Constitution. Because § 1983 itself does not establish or create any rights, the answer to this question requires an interpretation of the federal Constitution itself, rather than of § 1983." (footnote omitted)). Thus, the courts may use common law torts as a "starting point," but not as the "final word" on whether a constitutional violation has occurred. *Pierce*, 359 F.3d at 1288; *accord Wells*, 1982-NMSC-048, ¶ 6. The "common law" with which courts begin their analyses is "the general common law tradition, rather than . . . the law as defined by the jurisdiction where the action originated." *Pierce*, 359 F.3d at 1289.

{6}     "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). To overcome the qualified immunity defense, a "plaintiff must demonstrate that (1) the defendant's alleged conduct violated a constitutional or statutory right, and (2) the right was clearly established at the time of the conduct." *Williams v. Bd. of Cnty. Comm'rs of San Juan Cnty.*, 1998-NMCA-090, ¶ 24, 125 N.M. 445, 963 P.2d 522. "[A] legal point is clearly established . . . when it has been decided by either the

highest state court where the cause of action arose, by a United States court of appeals, or by the United States Supreme Court." *Sanders v. Montoya*,1999-NMCA-079, ¶ 12, 127 N.M. 465, 982 P.2d 1064 (alteration in original) (internal quotation marks and citation omitted). "The granting of qualified immunity results in immunity from suit." *Oldfield v. Benavidez*, 1994-NMSC-006, ¶ 12, 116 N.M. 785, 867 P.2d 1167.

**State Constitutional and Tort Claims**

{7}     Although a tort does not always rise to a constitutional violation, when it does, "the federal remedy under § 1983 for deprivation of constitutional rights is supplementary to a state remedy." *Wells*, 1982-NMSC-048, ¶ 13. Thus, "[t]he [NMTCA] does not prohibit a plaintiff from bringing an action for damages under the [NMTCA] where the plaintiff also pursues, by reason of the same occurrence, an action against the same government under 42 U.S.C. § 1983." *Id.* ¶ 16; *see* NMSA 1978, § 41-4-12 (1977) ("The immunity granted pursuant to [NMTCA] does not apply to liability for personal injury, . . . false imprisonment, false arrest, malicious prosecution, abuse of process, . . . or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.").

**Standard of Review**

{8}   On appeal from a grant of summary judgment based on qualified immunity, "[w]e view the evidence presented in the light most favorable to the party opposing summary judgment" and review the district court's decision de novo. *Archuleta*, 1999-NMCA-113, ¶ 6. We "look at the undisputed facts and those facts adduced by the party opposing summary judgment to see if there is any evidentiary support for finding a possible violation of law . . . . [I]f the law may have been violated, [we] must ask if that law was clearly established at the time of the alleged violation." *Id.* (internal quotation marks and citation omitted). But, if it is clear that the relevant legal issue was not clearly established at the time, we may not reach the first issue. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (stating that "[c]ourts have discretion to decide the order in which to engage the[] two prongs [of the qualified immunity analysis]"). As will be seen, for the most part the parties here do not dispute that the relevant law was clearly established when Plaintiff was arrested and thus, with one exception, our focus is on the "possible violation" part of the inquiry. If there is a genuine dispute over a material fact relevant to whether qualified immunity applies, summary judgment on this basis is improper. *Id*.

6

**Plaintiff's Claims**

{9}    As a preliminary matter, we note that Plaintiff made several arguments on appeal that we do not address because they were not adequately developed, not preserved, or raised for the first time in Plaintiff's reply brief. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be."); *State Farm Mut. Auto. Ins. Co. v. Barker*, 2004-NMCA-105, ¶ 20, 136 N.M. 211, 96 P.3d 336 ("We will not entertain an argument made for the first time on appeal."); *Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶ 29, 127 N.M. 282, 980 P.2d 65 (stating that "the general rule is that we do not address issues raised for the first time in a reply brief" except when the arguments are in response to issues raised in the answer brief). These arguments include (1) that Defendants targeted him because he is the former sheriff of the county; (2) that New Mexico's Constitution requires a different probable cause standard than the federal constitution because "the New Mexico Constitution has been interpreted more broadly than its federal counterpart"; and (3) that Defendants "selectively prosecuted" him when they did not charge the motor home driver for following too closely behind him.

{10}    Plaintiff's claims—and his arguments on appeal—can be grouped into four broad categories. He argues that (1) Defendants arrested him without probable cause,

(2) Defendants filed charges against him without probable cause, (3) Defendants used excessive force in the use of handcuffs during the arrest, and (4) Defendants retaliated against him for exercising his free speech rights during the arrest. We address each issue in turn.

**A.      Unreasonable Seizure—Counts I, V, and VII**

{11}      Plaintiff argues that Defendants violated his right to be free from unreasonable seizures when they arrested him without probable cause. He alleges that his arrest violated both the United States Constitution and the New Mexico Constitution, and constituted the tort of false imprisonment. *See* U.S. Const. amend. IV; N.M. Const. art. II, § 10. The parties agree that it is well-established that "arrest without probable cause is indeed a violation of the Fourth Amendment protection against illegal search and seizure" and that this protection was established at the time of Plaintiff's arrest. *Dickson v. City of Clovis*, 2010-NMCA-058, ¶ 7, 148 N.M. 831, 242 P.3d 398. Therefore, the only question here is whether there are disputed material facts concerning whether Defendants violated Plaintiff's rights or committed the tort of false imprisonment by arresting him without probable cause.

{12}      "A warrantless arrest is valid where the officer has probable cause to believe that a crime has been committed by the person whom he arrests." *State v. Jones*, 1981-NMSC-013, ¶ 7, 96 N.M. 14, 627 P.2d 409. "Probable cause exists when the

8

facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed." *State v. Cohen*, 1985-NMSC-111, ¶ 36, 103 N.M. 558, 711 P.2d 3. When probable cause is present, "a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." *Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, ¶ 12, 143 N.M. 84, 173 P.3d 6. Probable cause to arrest for a single charge will suffice to immunize Defendants from Plaintiff's wrongful arrest claims. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("An arrested individual is no more seized when he is arrested on three grounds rather than one; and so long as there is *a* reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed." (citing *Devenpeck v. Alford,* 543 U.S. 146, 153-55 (2004)). "Whether probable cause exists is a mixed question of law and fact." *Dickson*, 2010-NMCA-058, ¶ 8 (internal quotation marks and citation omitted).

{13}     We conclude that Plaintiff's arrest was supported by probable cause because it was reasonable for Shutiva to believe that Plaintiff assaulted a peace officer. Assault on a peace officer consists of "an attempt to commit a battery upon the person of a peace officer while he is in the lawful discharge of his duties" or "any unlawful

act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery." NMSA 1978, § 30-22-21(A) (1971). On appeal, Plaintiff does not dispute that he "aggressively argued his innocence," that he threw his wallet on the ground near the officers, and that he raised his arms in the air and pointed at the officers. In his deposition, Plaintiff admitted that he was yelling "at the top of [his] lungs" at the motor home driver and that he called the officers names and swore at them. Nevertheless, Plaintiff maintains that this charge was not supported by probable cause because no officer later testified that he felt in fear of an imminent battery. But Defendants are not required to prove every element of assault. *Holmes*, 511 F.3d at 679 ("Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction."). The question here is simply whether Shutiva had a reasonable belief at the time he made the arrest that Plaintiff was guilty of assault.

{14}     In *State v. Ford*, this Court examined whether a conviction for assault on a peace officer was supported by substantial evidence. 2007-NMCA-052, ¶ 29, 141 N.M. 512, 157 P.3d 77. There, the Court held that the evidence supported the conviction where defendant had "approached the officers coming within inches of them while shaking his fists at them." *Id.* ¶¶ 5, 29. The Court stated, "The evidence

10

against [the d]efendant that he was verbally and physically threatening to the officers . . . is sufficient to circumstantially support the inference that [the officer] was in fear of having his bodily integrity intruded upon." *Id.* ¶ 29. It concluded that "reasonable people under these circumstances being aggressively approached by a man, who is shouting and threatening to punch them, would fear for their personal safety. [The defendant] acted aggressively by raising his fists, shouting, and coming within a few inches of them." *Id*. Obviously, in *Ford*, the Court was examining whether the evidence supported a conviction of assault beyond a reasonable doubt, not, as here, whether an officer had a reasonable belief that an assault had occurred. In addition, the conduct here appears not to have been as threatening as that in *Ford*. Nevertheless, Plaintiff's conduct was sufficiently similar to that in *Ford* that it sufficed to establish probable cause for arrest for assault on a peace officer. The district court did not err in dismissing Plaintiff's claims based on lack of probable cause to arrest.

**B.       Malicious Prosecution/Malicious Abuse of Process—Counts II and VIII**

{15}     Counts II and VIII of the complaint allege that Defendants maliciously prosecuted him. In Count II, Plaintiff claims that his rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated when Defendants filed a complaint against him. *See* U.S. Const. amends. IV, XIV, § 1. He

11

also alleges in Count VIII that "Defendants were the actual and proximate causes of injury to Plaintiff when they caused the charging of him for crimes without probable cause." The latter claim appears to have been brought under the New Mexico Constitution and/or state tort law. We begin by discussing malicious prosecution claims under the United States Constitution.

{16} The law governing malicious prosecution under the Fourth and Fourteenth Amendments is convoluted. *See Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007) (describing the law of § 1983-based malicious prosecution claims as "murky"). That being the case, we start with some historical background to such claims. "There is . . . an embarrassing diversity of judicial opinion over the composition, or even existence, of a claim for 'malicious prosecution' founded in § 1983." *Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000) (internal quotation marks and citation omitted); 1 Sheldon H. Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 3:64 (4th ed. 2011) ("Before the Supreme Court's 1994 decision in *Albright v. Oliver*, [510 U.S. 266 (1994)] there was considerable uncertainty in the circuits about the nature and scope of these § 1983 malicious prosecution and abuse of process actions." (footnote omitted)). In *Albright*, the Supreme Court examined whether there existed "a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable

12

cause." *Albright*, 510 U.S. at 268; *see* Steven H. Steinglass, *1 Section 1983 Litigation in State Courts* § 3:11 (1988) (stating the issue as "whether malicious prosecution, standing alone, g[ave] rise to a constitutional violation actionable under § 1983."). "[A] plurality of the Supreme Court held [in *Albright*] that the Fourth Amendment governed pretrial deprivations of liberty" and that "Fourteenth Amendment substantive due process standards have no applicability." *Taylor v. Meacham*, 82 F.3d 1556, 1560 (10th Cir. 1996) (internal quotation marks and citation omitted); *see also* Nahmod, *supra*, § 3:66. But "[b]ecause of the absence of an opinion of the Court and the conflicting views of those Justices who only concurred in the judgment, the issue of the availability of § 1983 to pursue malicious prosecution-type claims will continue to be an area of uncertainty." Steinglass, *supra*. *Albright* left open the possibility that malicious prosecution may constitute a § 1983 claim based on a violation of another explicit constitutional right, such as those guaranteed by the Fourth Amendment or the Fourteenth Amendment's procedural due process protections. *See Albright*, 510 U.S. at 271 (stating that the plaintiff did not raise his claim under the Fourth Amendment or procedural due process and thus his "claim before [the] Court [wa]s a very limited one[]"); Nahmod, *supra*, § 3:66.

{17}    Case law following *Albright* has taken a variety of paths. *See* Nahmod, *supra*, § 3.67 (stating that "the impact of *Albright* has been dramatic[,]" describing the state

of the law as "complicat[ed,]" and collecting cases). But "[f]or the most part, the Courts of Appeals which have considered the issue have recognized a Fourth Amendment malicious prosecution action subsequent to *Albright*," Michael Avery, et al., *Police Misconduct: Law and Litigation* § 2:14 (3d ed. 2014), and some have recognized a malicious prosecution claim based on other constitutional provisions. *Avery*, *supra*, § 2:14, at n.5. For example, the Tenth Circuit has recognized malicious prosecution claims based on both the Fourth Amendment and the Fourteenth Amendment procedural due process. *See Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 2842 (2014) ("Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims."); *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008) ("This Circuit . . . has held that the [United States] Constitution permits [procedural] due process claims for wrongful imprisonment after the wrongful institution of legal process.").

**Fourteenth Amendment**

{18}   "The Fourteenth Amendment protects individuals against deprivations of liberty without due process of law." *Myers*, 738 F.3d at 1193. "[T]he Due Process Clause of the Fourteenth Amendment confers both substantive and procedural rights." *Albright*, 510 U.S. at 272. To the extent that Plaintiff alleges a violation of his

14

substantive due process rights, the United States Supreme Court foreclosed that avenue in *Albright*, as discussed. To the extent that Plaintiff alleges a violation of his procedural due process rights, this argument is also unavailing. "If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy—such as a state tort claim—will satisfy [procedural] due process requirements." *Myers*, 738 F.3d at 1193. Since New Mexico tort law provides a remedy for malicious abuse of process,[1] sufficient procedural due process has been provided to Plaintiff. *See id.* (stating that "[t]he existence of the state remedy flatten[ed] the Fourteenth Amendment peg on which [the plaintiff tried] to hang his § 1983 malicious[]prosecution claim" and holding that the plaintiff's Fourteenth Amendment malicious prosecution claim was properly dismissed). Hence, to the extent Plaintiff's malicious prosecution claim was based on the Fourteenth Amendment, it was properly dismissed.

**Fourth Amendment**

{19}     We turn next to the Fourth Amendment as a basis for a malicious prosecution claim. Because Plaintiff makes the same arguments for his Fourth Amendment and

---

[1]In *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶ 53, 124 N.M. 512, 953 P.2d 277, *overruled on other grounds by Durham v. Guest,* 2009-NMSC-007, ¶ 29, 145 N.M. 694, 204 P.3d 19, the New Mexico Supreme Court held that "malicious prosecution and abuse of process should be restated as a single cause of action known as malicious abuse of process."

state law claims, we discuss them together. A Fourth Amendment malicious prosecution claim is distinguished from a Fourth Amendment false arrest claim by the institution of legal process. *Myers*, 738 F.3d at 1194. "[L]egal process" can be instituted by the filing of a criminal complaint. *Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir. 2001); *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 98 (D. Mass. 2009). Because the constitutional right protected by the Fourth Amendment is the freedom from unreasonable seizures, a claimant must, as a foundational matter, demonstrate a "significant restriction on liberty." *Becker*, 494 F.3d at 915. Further, in the Tenth Circuit, analysis of a § 1983 malicious prosecution claim is guided by the following elements:  "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

**New Mexico Tort Claims**

{20}    Under New Mexico tort law, to prevail on a malicious abuse of process claim a plaintiff must demonstrate "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3)

16

damages." *Durham*, 2009-NMSC-007, ¶ 29. "An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process." *Id.* (alteration, internal quotation marks, and citation omitted). In this context, "probable cause [i]s the reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *DeVaney*, 1998-NMSC-001, ¶ 22 (citations and footnote omitted). The probable cause analysis focuses on what the officer knew at the time the complaint was filed. *Weststar Mortg. Corp. v. Jackson*, 2003-NMSC-002, ¶ 16, 133 N.M. 114, 61 P.3d 823 ("Probable cause . . . is to be judged by facts as they appeared at the time, not by later-discovered facts." (internal quotation marks and citation omitted)). Finally, "the tort of malicious abuse of process [is] construed narrowly [in order] to protect the right of access to the courts." *Id.* ¶ 14 (internal quotation marks and citation omitted).

{21} Plaintiff alleged in his complaint that the charges were not based on probable cause. The district court based its ruling solely on its determination to the contrary that probable cause supported the charges. The parties did not raise or argue any of the other elements associated with malicious prosecution in the district court or on appeal. Thus, we too focus only on whether the district court's grant of summary

judgment on the basis of probable cause for both the constitutional and tort claims was proper.

{22} The district court found that "[o]ne or more of the charges brought against Plaintiff were based upon probable cause." Neither party addresses whether probable cause to support one charge precludes a malicious abuse of process claim for charges not supported by probable cause. Therefore, we assume without deciding that in this context probable cause for a single charge does not preclude such a claim for unsupported charges. *See Holmes*, 511 F.3d at 682-683 ("[P]robable cause to believe an individual committed one crime—and even his conviction of that crime—does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge."); *but see Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶ 20, 142 N.M. 150, 164 P.3d 31 ("[P]robable cause relates to the complaint as a whole, and the original plaintiff need not show favorable termination of each individual claim to establish an effective defense to a subsequent suit for malicious abuse of process.").

**Leaving the Scene of an Accident**

{23} We begin with the charge of leaving the scene of an accident, contrary to NMSA 1978, § 66-7-201(D) (1989), and failure to comply with the requirements set out in NMSA 1978, 66-7-203 (1978). Immediately after the accident, the motor home

driver called 911 and reported that he had rear-ended a truck and that the truck's driver had not stopped. Plaintiff does not dispute that the motor home hit his truck and that he did not immediately stop. Instead of disputing these facts, Plaintiff maintains that he did not know that he had been hit and complied with Defendants' request for his identification when they stopped him and, therefore, did not violate Sections 66-7-201(C) or -203, which require drivers involved in traffic accidents to stop and provide identification and assistance to the other driver. These arguments are unavailing for two reasons. First, Plaintiff was arrested and charged for failure to comply with Section 66-7-201(D), not (C). Unlike Subsection (C), Subsection (D) does not require that a person "knowingly" fail to stop. *Compare* § 66-7-201(C) *with* § 66-7-201(D). Second, Section 66-7-203 requires a person to provide certain information, including his or her driver's license, "to the person struck or the driver or occupant of . . . any vehicle collided with." The fact that Plaintiff provided his identification to *Defendants* after they stopped him is therefore irrelevant to his compliance with Section 66-7-203. Because it was reasonable for Defendants to believe that a crime had been committed based on Plaintiff's admissions, this charge was supported by probable cause.

19

**Resisting Arrest**

{24} The criminal complaint alleges that Plaintiff "intentionally fled, resisted, obstructed, or attempted to evade or evaded [Defendant] Shutiva, . . . knowing that the officer was attempting to apprehend or arrest [him]." *See* NMSA 1978, § 30-22-1 (1981). The charge thus requires both evasive or obstructive behavior and knowledge that the officer is attempting to arrest.

{25} The evidence presented to the district court demonstrates disparate views of the facts. For instance, Plaintiff stated that it was Martinez who handcuffed him, whereas Shutiva testified that he placed Plaintiff in handcuffs. Plaintiff stated in his deposition that Shutiva told him he was under arrest for "hit and run" after he was pulled over but before he was handcuffed. But Shutiva testified that he did not tell Plaintiff that he was under arrest before Plaintiff was handcuffed and did not tell him until "later through the investigation." While Plaintiff testified that Martinez told him to turn around and put his hands on the hood of the truck, that he did not put his hands on the truck, and that Martinez then "turned [him] around and . . . forced [him] down and . . . put the handcuffs on [him]," Shutiva testified that he "turned [Plaintiff] around to begin placing handcuffs on him[,]" that Plaintiff was "uncooperative, yelling at [him,]" and that Shutiva "remember[ed Plaintiff] pulling away a bit."

20

{26}     Both parties cite to the dashcam video of the stop in support of their version of the facts surrounding the handcuffing. Although they recognize that the facts must be construed in Plaintiff's favor, Defendants rely on *Scott v. Harris* for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. 372, 380 (2007); *see State v. Martinez*, 2015-NMCA-___, ¶ 16, ___ P.3d. ___ (No. 32,516, Jan. 6, 2015) (relying on a dashcam video and on a Texas case in which the Texas Criminal Court of Appeals reversed a denial of a suppression motion where the video included "indisputable visual evidence contradicting essential portions of the officer's testimony, and . . . the evidence presented on the video did not turn on an evaluation of credibility and demeanor" (internal quotation marks and citation omitted)). *Scott* and *Martinez* are distinguishable because in those cases the video was used to establish a fact that did not depend on interpretation of people's body language or demeanor. Here, while the identity of the officer doing the handcuffing might be conclusively resolved by the video, even Defendants acknowledge that some parts of the handcuffing are obscured and that it is not clear whether Plaintiff pulled the officer with him into the cab of the truck or was pushed by the officer. In addition, whether Plaintiff's movement during

the handcuffing constituted resisting arrest depends on one's interpretation of that movement.

{27} *Perez v. City of Albuquerque* presents a more analogous use of a video. 2012-NMCA-040, 276 P.3d 973. In that case, this Court assessed the propriety of a denial of a motion for directed verdict where the defendant argued that "there [wa]s only one interpretation of the videotape [of the defendant's arrest] and that no reasonable factfinder could disagree that the [police o]fficers acted unreasonably after [the p]laintiff was handcuffed." *Id.* ¶ 9. The Court disagreed, stating that the plaintiff's reliance on *Scott* was misplaced because "[r]easonable jurors watching the videotape and hearing the testimony of [the] witnesses could disagree over the constitutionality of the [police o]fficers' actions." *Id.* ¶ 10. Thus, "[w]hether the actions of the [police o]fficers were unreasonable under the circumstances was a question for the jury to decide." *Id.* The question here is whether Shutiva had probable cause to charge Plaintiff with resisting arrest, which hinges on whether it was reasonable for Shutiva to believe that Plaintiff was guilty of the charge. Like in *Perez*, and unlike in *Martinez* and *Scott*, that question depends in part on interpretation of Plaintiff's demeanor. Combined with the conflicts in the deposition testimony, we conclude that the interpretation of the video gives rise to a dispute over material facts related to the

existence of probable cause. The district court erred in granting summary judgment as to this claim.

**Assault on Motor Home Driver**

{28} Finally, we examine whether the charge of assault on the motor home driver was supported by probable cause. We begin by setting out the undisputed facts. First, after being pulled over, Plaintiff loudly challenged the motor home driver to tell him why the motor home driver had called the police. Plaintiff admitted in deposition testimony that he was yelling "at the top of his lungs" at the motor home driver to "[c]ome over here, motherfucker[]. Tell me to my face. Don't be telling it to the cops. Tell it to my face what the fuck you're doing." Second, the parties agree that Plaintiff was raising his arms, although they differ on the precise nature of the gesture. Shutiva testified that Plaintiff was making "a challenging motion . . . . Like somebody calling you on to a fight. And waving his arms in the air. Like [a] 'bring it on' type of gesture." Plaintiff states on appeal that he "rais[ed] his hands into the air" while challenging the motor home driver and that he "pointed toward the sky in an angry manner." Third, both Plaintiff and Shutiva testified in their depositions that the motor home was approximately fifty yards from Plaintiff at the time. Fourth, the parties agree that there were three officers present at the time.

23

{29}     The criminal complaint alleges that Plaintiff "did perform an unlawful act, threat[,] or menacing conduct which caused [the motor home driver] to reasonably believe that he was in danger of receiving an immediate battery, contrary to [NMSA 1978, Section] 30-3-1 [1963]." The uniform jury instruction associated with assault states the elements of the charge in relevant part as follows.

> 1.     The defendant [description of the unlawful act, threat[,] or menacing conduct committed by the defendant];

> 2.     The defendant's conduct caused [the victim] to believe the defendant was about to intrude on [the victim's] bodily integrity or personal safety by touching or applying force to [the victim] in a rude, insolent or angry manner;

> 3.     A reasonable person in the same circumstances as [the victim] would have had the same belief[.]

UJI 14-302 NMRA. The phrase "touching or applying force to [the victim] in a rude, insolent or angry manner" in UJI 14-302 echoes the language of the uniform jury instruction for battery and applies to the "battery" referenced in the assault statute. *See* UJI 14-320 NMRA; § 30-3-1; NMSA 1978, § 30-3-4 (1963). Similarly, the phrase "about to" refers to the statute's requirement that the threat be "immediate." *See* § 30-3-1. "About to" is defined in the Merriam-Webster Dictionary as "on the verge of." http://www.merriam-webster.com/dictionary/about (last visited Feb. 10, 2015). Similarly, our case law has equated the phrase with "imminent." *See, e.g.*, *State v. Chavez*, 1982-NMCA-072, ¶ 13, 98 N.M. 61, 644 P.2d 1050 (holding that

24

" '[i]mminent' means: 'about to happen'; 'ready to take place'; 'near at hand' " (citation omitted); *State v. Valdez*, 1990-NMCA-134, ¶ 14, 111 N.M. 438, 806 P.2d 578 (stating that while there was no evidence that the defendant was "about to" destroy evidence, the police could have acted without a warrant if "destruction became imminent"); *cf. Romero v. Sanchez*, 1995-NMSC-028, ¶ 12, 119 N.M. 690, 895 P.2d 212 (equating an "immediate battery" with an "imminent battery"). "Imminent" means "happening very soon" or "ready to take place." *Merriam Webster Dictionary*, http://www.merriam-webster.com/dictionary/imminent (last visited Feb. 10, 2015).

{30} With this background in mind, we return to the question of whether the charge of assault on the motor home driver was based on a reasonable belief that the crime of assault had occurred. In other words, was it objectively reasonable for Shutiva to believe that Plaintiff had assaulted the motor home driver? This determination in turn depends on whether it would have been objectively reasonable for the motor home driver to believe that he was about to be battered. Based on the undisputed facts, we conclude that it was neither reasonable for the motor home driver to believe that a battery was imminent nor for Shutiva to believe that Plaintiff had committed assault against the motor home driver because (1) the driver was in the motor home fifty yards away from Plaintiff, and (2) there were three officers at the scene at the time.

We conclude that the assault charge was not supported by probable cause, and the district court erred in granting summary judgment on this issue. *See Yucca Ford, Inc. v. Scarsella*, 1973-NMCA-042, ¶ 6, 85 N.M. 89, 509 P.2d 564 ("If the facts are sufficient to show an absence of probable cause and are not disputed, this determination disposes of the probable cause issue.")

{31} In sum, we conclude that (1) the district court properly granted summary judgment as to Plaintiff's malicious prosecution claim based on the charge of leaving the scene of an accident, (2) there are disputed issues of material fact that preclude summary judgment as to Plaintiff's malicious prosecution claim based on the resisting arrest charge, and (3) summary judgment as to Plaintiff's malicious prosecution claim based on the assault on the motor home driver was improper because there was no probable cause supporting the charge. The district court's order as to Counts II and VIII is thus affirmed in part and reversed in part.

**Excessive Force—Counts III and VI**

{32} Plaintiff alleged in his complaint that Defendants used excessive force in their use of handcuffs in violation of his Fourth Amendment right to be free from unreasonable seizures. He also alleged personal injuries due to excessive force under the NMTCA. The district court granted summary judgment as to this issue, stating that "[t]he force used by [Defendants] attendant to the arrest of Plaintiff was

reasonable" and that " Plaintiff did not present evidence or otherwise show that the force used by [Defendants] to effectuate the arrest of Plaintiff violated clearly established law."

{33}     When "officers move for qualified immunity on an excessive force claim, a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have . . . thought the force constitutionally permissible (violates clearly established law)." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) (en banc). Because "[t]he right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person[,]" we focus on whether the force used here was impermissible. *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) (internal quotation marks and citation omitted). In excessive force claims, the use of handcuffs "could constitute excessive force if a plaintiff alleges: "(1) 'some actual injury that is not *de minimis,* be it physical or emotional[;]' and (2) that the officer ignored the 'plaintiff's timely complaints . . . that the handcuffs were too tight.' " *Griffin v. Penn*, 2009-NMCA-066, ¶ 18, 146 N.M. 610, 213 P.3d 514 (quoting *Cortez,* 478 F.3d at 1129 (alteration in original))[2]. For

_____

[2]In *Griffin*, the Court addressed an excessive force claim under the Eighth Amendment, not the Fourth Amendment. It acknowledged "that excessive force claims utilize different standards under the Fourth and Eighth Amendments" and stated that "[t]he differing standards [in United States Supreme Court cases] make

example, in *Griffin*, the plaintiff alleged that the use of handcuffs constituted excessive force. *Id.* ¶ 17. In considering whether summary judgment had been properly granted, the *Griffin* Court accepted the plaintiff's allegation that the defendants ignored his complaints that the handcuffs were too tight, but nevertheless concluded that plaintiff's claim failed as a matter of law because he did not present evidence of an "actual injury." *Id.* ¶ 20.

{34} Here, Plaintiff testified in his deposition that the officer handcuffing him "squeezed [the handcuffs] as hard as he could," that the handcuffs were too tight, that the resultant bruising turned his hands "black" and that, although he did not seek treatment for injuries to his hands and wrists after an initial visit to the hospital, he has suffered mental and emotional distress severe enough to require medication. Plaintiff also presented a color photograph of his bruised wrists to the district court. In addition, Plaintiff testified that after he complained that the handcuffs were too tight, "[an] officer loosened [the] right one and . . . tried to loosen the left one[,] but . . . didn't." He stated that the officers "unloosened [the handcuffs] but they were still too tight." But Plaintiff also testified that he bruises easily. Additionally, although he maintained that "the bruising [was] because the handcuffs [were] too tight," he

---

clear that the Fourth Amendment provides greater protection to plaintiffs on claims of excessive force than does the Eighth Amendment." 2009-NMCA-066, ¶ 20 n.1. It then applied Fourth Amendment principles in analysis of the plaintiff's claim. *Id*. Thus the holding in *Griffin* is applicable here.

also admitted that the bruising could have been caused by his own struggling against them. Viewing the evidence in the light most favorable to Plaintiff, we conclude that this evidence establishes a question of fact as to excessive force in handcuffing sufficient to preclude summary judgment on this claim. *See Archuleta*, 1999-NMCA-113, ¶ 6.

**Retaliatory Arrest—Count IV**

{35}     Count IV of Plaintiff's complaint alleges that he was arrested in retaliation for his speech, which is protected by the First Amendment to the United States Constitution[3]. U.S. Const. amend. I. The district court found that "Plaintiff's speech consisted of personal epithets that were 'fighting words' rather than protected speech under the First Amendment."  It also stated that

> As Defendants had probable cause to arrest . . . Plaintiff [for] leaving the scene of an accident pursuant to [Section] 66-7-201(D) . . . , Plaintiff could not show that his arrest was in retaliation for his speech. Regardless, as set forth above, Plaintiff's speech was not protected . . . under the First Amendment.

---

[3]Plaintiff alleged both retaliatory arrest and retaliatory prosecution in his complaint. The Supreme Court of the United States has distinguished between retaliatory arrest and retaliatory prosecution. *See Reichle v. Howards*, 132 S. Ct. 2088, 2094-95 (2012) (discussing *Hartman v. Moore*, 547 U.S. 250, 265 (2006), and holding that the holding in *Hartman* pertaining to retaliatory prosecution may not extend to retaliatory arrests). Because neither Defendants' motion to dismiss nor the district court's order addressed the retaliatory prosecution claim, we also do not address it.

We first address whether Plaintiff's speech constituted "fighting words" unprotected by the First Amendment.

{36} In 1942, the United States Supreme Court defined " 'fighting' words [as] those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. N.H.*, 315 U.S. 568, 572 (1942). This definition was refined in 1971 as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. Cal.*, 403 U.S. 15, 20 (1971). But both the United States Supreme Court and New Mexico courts have recognized that police officers are not ordinary citizens. In *City of Hous., Tex. v. Hill*, 482 U.S. 451, 462 (1987), the United States Supreme Court recognized that "even the 'fighting words' exception recognized in *Chaplinsky* . . . might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.' " (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (Powell, J., concurring) (quoting his concurrence in *Lewis v. City of New Orleans*, 408 U.S. 913 (1972)). Similarly, in *City of Alamogordo v. Ohlrich*, 1981-NMCA-028, ¶¶ 2, 5, 95 N.M. 725, 625 P.2d 1242, where the defendant called the police officer a "mother fucking son-of-a-bitch," this

30

Court stated, "A trained police officer is not an average person." Finally, in *State v. Wade*, 1983-NMCA-084, ¶ 17, 100 N.M. 152, 667 P.2d 459, "[t]he defendant was upset at what he thought was an unwelcomed intrusion into a family argument [by police officers]. He screamed obscenities, waved his arms, and yelled at the officers to 'get the hell out of the house.' " This Court held that "[s]creaming obscenities and yelling 'get the hell out of the house' do not amount to 'fighting' words, particularly when they are addressed to police officers, who are supposed to exercise restraint." *Id*. We conclude that the district court erred in finding that Plaintiff's speech fell within the "fighting words" exception to the First Amendment.

{37} Having concluded that Plaintiff's speech was protected, we turn next to whether the district court properly dismissed this claim on the ground that the arrest was supported by probable cause. Plaintiff alleged that his arrest was based on improper motives. We have already concluded that Defendants had probable cause to arrest Plaintiff. Thus, we agree with this portion of the district court's order. Where we depart from the district court is on its conclusion that the existence of probable cause automatically precludes a claim for retaliatory arrest. We explain.

{38} In 2006, the United States Supreme Court decided *Hartman*, holding that a plaintiff must plead and prove an absence of probable cause for prosecution in order to prevail on a retaliatory prosecution claim. 547 U.S. at 265. After *Hartman*, the

31

courts were divided on whether its holding applied to both retaliatory prosecution and retaliatory arrest claims. *Reichle*, 132 S. Ct. at 2096 (listing cases); John Koerner, *Between Healthy and Hartman: Probable Cause in Retaliatory Arrest Cases*, 109 Colum. L. Rev. 755, 775 (2009) (observing in 2009 that "[r]etaliatory arrest case law is a mess, with some courts siding entirely with *Hartman*, others rejecting *Hartman* outright, and still others having yet to take a position."). The Tenth Circuit's case law before *Hartman* had held that "a First Amendment retaliation claim[ant] in this circuit was not required to show that the defendants lacked probable cause for their actions." *Howards v. McLaughlin,* 634 F.3d 1131, 1146 (10th Cir. 2011) (citing *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990), *rev'd and remanded sub nom. Reichle*, 132 S. Ct. 2088). In *Howards*, the Tenth Circuit held that because the focus in *Hartman* was on retaliatory prosecution, rather than retaliatory arrest, this holding was undisturbed. *Id.* at 1148. Consequently, it "decline[d] to extend *Hartman*'s 'no-probable-cause' requirement to [a] retaliatory arrest case" and "permit[ted] Mr. Howards to proceed with his First Amendment retaliation claim notwithstanding probable cause existed for his arrest." *Id.* at 1148-49.

{39} The United States Supreme Court granted certiorari on two questions: "whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest, and whether clearly established law

32

at the time of Mr. Howards' arrest so held." *Reichle*, 132 S. Ct. at 2093. Recognizing that the defendants would be entitled to qualified immunity if it answered either question in the negative, the Court examined the state of the law on retaliatory arrest in the wake of *Hartman*. *Reichle*, 132 S. Ct. at 2093. The Court began by stating that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (alteration, internal quotation marks, and citation omitted). Next, the Court clarified that the specific right at issue was "not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Id.* at 2094.

{40} With this framework established, the Court stated that it had "never held that there is such a right." *Id*. It also stated that, "[a]ssuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law," *id.*, Tenth Circuit precedent also did not constitute clearly established law on this issue because "*Hartman* injected uncertainty into the law governing retaliatory arrests, particularly in light of *Hartman*'s rationale and the close relationship between retaliatory arrest and prosecution claims." *Id.* at 2096-97. Stating that "[a] reasonable official also could have interpreted *Hartman'*s rationale to apply to retaliatory

33

arrests[,]" *id.* at 2095, the Court held that "when Howards was arrested it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation." *Id.* at 2097. Since the law was not clearly established, the defendants were entitled to qualified immunity and the lower court's decision was reversed. *Id*.

{41}     *Reichle* controls our analysis here. In that case, the arrest took place in 2006 and the opinion was filed in 2012. *Id.* at 2091. Here, Plaintiff was arrested in August, 2010. There is no indication that the law as to this issue was any more clear on that date than it was in 2006. Indeed, two Tenth Circuit cases addressing arrests in 2009 and 2010 have relied on *Reichle* to hold that the defendants were entitled to qualified immunity because it was still unclear at that time whether a retaliatory arrest claim could lie in the presence of probable cause. *See Wilson v. Vill. of Los Lunas*, 572 F. App'x 635, 643 (10th Cir. 2014) (unpublished) ("*Reichle* therefore compels the conclusion that the law as to First Amendment retaliatory arrest in the presence of probable cause was no more clearly established in July 2009 . . . than it was in June 2006."); *Moral v. Hagen*, 553 F. App'x 839, 840 (10th Cir. 2014) (unpublished) (addressing a 2010 arrest and stating that it "remains unsettled under current law whether an officer violates the Fourth Amendment by initiating an arrest for retaliatory reasons when the arrest itself happens to be supported, as an objective

34

matter, by probable cause"); *Moral v. Hagen*, No. Civ.A. 10-2595-KHV, 2013 WL 1660484, at *6 (D. Kan. Apr. 17, 2013) (stating that the arrest was in January 2010), *aff'd,* 553 F. App'x 839 (10th Cir. 2014)). *But see Storey v. Taylor*, 696 F.3d 987, 997 (10th Cir. 2012).

{42}     We conclude that, because it was not clear at the time that Plaintiff was arrested whether a claim for retaliatory arrest would lie when probable cause supported the arrest, Defendants are entitled to qualified immunity on this claim. We therefore affirm the district court's grant of summary judgment as to Plaintiff's First Amendment/retaliatory arrest claim, although on a different basis.

**III.    Conclusion**

{43}     We affirm the district court's order as to Counts I, IV, V, VI, VII, and parts of Counts II and VIII. We reverse the district court as to the portion of Counts II and VIII pertaining to assault on the motor home driver because, based on the undisputed facts, there was no probable cause to charge Plaintiff for assault. Because there is a genuine issue of material fact as to whether there was probable cause to charge Plaintiff with resisting arrest, we reverse the grant of summary judgment on that portion of Counts II and VIII as well. Finally, we reverse the district court's grant of summary judgment as to Plaintiff's excessive force claims in Counts III and VI.

{44}    **IT IS SO ORDERED.**

_____
                        **MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Chief Judge**

_____
**J. MILES HANISEE, Judge**